In this case, the district court erred when it upheld a checkpoint search and seizure for two reasons. First, the facts show that the agent unreasonably prolonged the immigration stop on the basis of an unarticulated hunch that prolonged extending the scope of the detention and tainting any subsequent consent. Second, the district court erred in applying a legally incorrect standard for voluntariness, requiring Mr. Ortiz to show why a reasonable person would not consent. Because the purported consents were tainted and involuntary, the court should reverse the directions to suppress the fruits of the search. Now this is somewhat a case of first impression for this circuit, because there are no cases factually on point to a stop of a common carrier at a permanent checkpoint. But the Fifth Circuit has dealt with this in the case Portillo-Aguirre, and there the Fifth Circuit suppressed the evidence as constituting an illegal search. The facts are very similar. There was a bus stop at a permanent checkpoint. The officers went on board to make immigration checks. They completed the immigration check of Mr. Portillo, and then afterwards noticed a bag and extended the detention in order to make inquiries about this bag without any reasonable suspicion. The Fifth Circuit suppressed that because the only basis for the continued discussion was the presence of the bag, and what looked like nervous behavior on the part of Mr. Portillo. You said you used the word extended. I believe the United States argues that this was an extended border search. Yes, Your Honor, and that is incorrect. This Court has held in Bowen-Ombank decision that a checkpoint that is not necessarily the same as a border. The distance from the border here, we have a permanent checkpoint that's 60 miles from the border, and the majority of travelers that go through this checkpoint aren't international travelers. Those are the factors that are usually looked at for deciding whether a checkpoint is the functional equivalent of a border, its nearness, and the likelihood that the majority of the traffic is international travelers. That, of course, creates the nexus that would make it the functional equivalent of a border. This is a checkpoint that is allowed to be held in the interior of the United States for immigration purposes under Martinez-Fuerte, but it's not the border. The border is 60 miles south, and that's where the border protections exist. And under Martinez-Fuerte, there are additional, there's a much more limited scope for the administrative search at a permanent checkpoint so far from the border. I mean, because this all comes down to whether this was an immigration check and whether that was still going on when Officer Page asked Mr. Ortiz to exit the van and continue until the drugs were found. And I guess I just want to make sure I understand your argument. When did the separation take place? When did it stop being an immigration check and then become something else? Well, in this case, I agree with the government that it never stopped being an immigration check. There was never anything, any reasonably articulated basis for suspecting anything else. The two likely possibilities are Agent Page suspected Mr. Ortiz was not legally in the country, or he suspected that he was smuggling contraband. Now, he never said anything about contraband, and nothing that he articulated would reasonably support the belief that this man was carrying contraband. Everything that occurred, the government even says in their brief that everything that occurred from the initiation of the stop to the finding of the drugs was aimed at an immigration status check. So the whole suspicion was always whether Mr. Ortiz was in the country legally. But that question was resolved definitively when he handed Agent Page a valid U.S. passport. And so in this case, he handed him the passport. They're outside of the van, correct? No, he handed him the passport while he was in the van. In the van. But he couldn't see him very well, so that's when he asked him to step out. Is there a problem with that? Yes. I mean, there's a number of problems with that. First, that's a very significant intrusion by asking someone to alight. The government likes to analogize it to a secondary inspection, but there's a number of reasons why that analogy doesn't hold. Tell me why. Number one, this bus was already in the functional equivalent of secondary inspection. There is a dedicated bus lane at the San Clemente checkpoint. That's already secondary inspection because under the field inspector's manual, primary inspection is intended to make a rapid questioning of whether a person has a right to be in the country. Secondary inspection is for inspections that are going to take longer than the rapid traffic. In order to keep traffic flowing, they move things to secondary inspection. By having a dedicated bus lane, obviously buses and vans are going to take much longer to inspect than an ordinary private vehicle, and that's why they have this dedicated lane. It's already secondary. People who ride on the buses can expect that their delay is going to be longer than a private vehicle because of just the fact that it takes longer to inspect the number of people on a bus or a van. So we're already in secondary inspection, and in any case, getting off the van, bringing your luggage, because as the agents testified, there's a possibility the van is going to be sent on and this person is going to be left without their ride with losing their paid fare. That's an extensively greater intrusion than asking a car to move from primary to secondary. Now, that's simply asking a vehicle to go to a different area in the inspection area. That is not what we have here. We have a vehicle that's already in secondary, and you're asking someone to get off the van with their luggage in case they're left behind. And so... When you say it was already in secondary, it wasn't officially in secondary. You're analogizing it to be already in secondary. I'd say that it's the functional equivalent of secondary because it's serving the same purpose which in the field inspector's manual that inspectors are supposed to send vehicles to secondary. So what was the agent to do when he couldn't see him and he had the passport in hand to verify that this was the individual? There's at least a couple of reasonable alternatives. He said he could only get a view over the right side of his face, and he didn't think that was suspicious. He thought it was because he was the middle person between two other people. He could have asked Mr. Ortiz to turn around and face him directly, or he could have asked the people on either side to move so that Mr. Ortiz could have given him a better view of his face. We know in any case that that was possible because he testified that Mr. Ortiz exited the van by climbing over the back of the seat. When he did that, he was able to face Agent Page directly on. And so it's apparent that he could have moved in his seat to, first of all, just get a better view. But the thing is, even when he had that opportunity by asking Mr. Ortiz to alight, the testimony of Agent Page says, I never looked at him, I never looked at the passport. The one concern he had was, is this Mr. Ortiz's passport? Because he didn't have any doubt that it was a valid passport. He just didn't know if this belonged to Mr. Ortiz. What's the obvious, reasonable way of checking that? Look at the photograph, look at Mr. Ortiz, the same way border inspectors determine whether a passport belongs to the person who's presenting it. Look at the photograph, look at the person. Agent Page didn't do that. He said, I didn't get to it. He didn't get to it because he was going on with something else that he never articulated, a concern that was never appeared on the record. Why was he going on and not checking the passport? Well, I think what played out, according to the record here, is when he asked him to come out, he noticed that all he had was a very light backpack, and so then he focused on the backpack. Well, I think he did, Your Honor, because he didn't go to the backpack. The next thing he did was instead of checking the passport, instead of looking at the backpack, he started asking him questions about his return ticket. And he asked to see the return ticket. Why? Again, because of immigration concerns. He was concerned he knew that smugglers often give tickets that have the tickets indicate that a number were issued at the same time, which suggests that this is a smuggler's ticket, or the name doesn't match because the smuggler has bought the ticket. So he examined the ticket. He asked him questions about the ticket. He's still going to the same questions of are you in this country legally or are you a smuggled alien? The answer to that question was in his hand. He had the passport. He didn't even use it for the purpose that he said he was asking Mr. Ortiz to like. Did you want to reserve a little bit of time? Yes, I'll leave that for a minute. Thank you. Thank you. Good morning. May it please the Court, Victor White for the United States. I want to just begin with Appellant Counsel's last remarks that the answer was in Mr. Ortiz's hand because that hand was a shaky hand. And before Mr. Ortiz was asked to exit the shuttle van, his hand was shaky when he handed that passport to the agent. And really, the guiding concern, the touchstone of Fourth Amendment analysis is reasonableness. And here the district court found that Mr. Ortiz's less than 10-minute questioning at the San Clemente permanent checkpoint was at all times reasonable. Well, does the shaky hand all of a sudden give him then the basis to start searching him and his person? For searching him and his person, not at that moment, but in conjunction with the agent's training and experience and the other factors that he articulated. Even before he was asked to exit the van, the defendant was already following what the agent termed to be a scripted answer. The agent had asked him where he was from. Mr. Ortiz replied, from California. He didn't give a more specific geographic locale like San Diego or some other place. He did also ask him questions about where he was born, what country he was a citizen of. But again, based on Agent Page's training and experience, and he's had two years of training at the San Clemente checkpoint encountering these shuttle vans. And it's very important to notice the distinction between some of the bus cases that are cited by appellant and the fact that this was a shuttle van. And the district court made that specific finding as to the fact that the agent was outside the shuttle van and was unable to really get a good view of Mr. Ortiz, who was basically flanked on either side of him by other passengers in this shuttle van. Yes, I would like to ask you about an issue mentioned by appellant's counsel concerning the district court applying the wrong standard, applying a standard sort of that anyone in this position would consent to an examination or search of the bag. Did the district court, notwithstanding those comments, did the district court make any findings as to the voluntariness of Mr. Ortiz's consent? The district court did make the finding that Mr. Ortiz's will was not overborne. And I believe that the context in which we need to analyze the district court's finding as to from the defendant's perspective was always from the reasonable circumstances. The district court judge was applying a totality of circumstances approach. He announced at the beginning of his decision that this was an extended border check and mentioned that he's aware of what happens at the border in terms of protocol. This is at the excerpt of record at 6. And then he, in his analysis, this is excerpt of record 10, is where he's looking at the fact that he rejects the argument that it was going to be a pretextual questioning, that this was basically he says that the Agent Page had no thought that this was going to be a drug bust. And then he says, furthermore, on the issue of consent, looking at it from the defendant's perspective, why wouldn't he consent? What could be more benign than a backpack with a pair of shoes? And he goes on to say, now, he may have. So, you know, he's obviously not going to have a problem with consenting. I don't think his will was overborne. I think he's going to consent under any circumstances, even going so far as to say that had the agent informed him of the right not to give consent, he would have consented. And what's driving that analysis is the fact that we're at an immigration, a permanent checkpoint. We're not in a situation like the previous cases where there's questioning whether or not there was the validity of the stop. Here, the questioning is all aimed at immigration questioning. But didn't the agent have his passport the whole time? He did have his passport. But the issue is, as the Supreme Court has noted with traffic stops. So would the defendant here, do you think, would have felt free to turn down Agent Page's request to search him when he had the passport during that entire time they were interacting? Well, the test or no? Sorry. No, the test is actually not whether he would be free to leave. Because, again, he's at the permanent checkpoint. This is a place where there is valid immigration questioning. Would he have been free to turn down? I mean, there's certain five factors that the district court didn't really look at. I mean, he looked at the totality, but he went right to, well, made this conclusion that, you know, if he didn't have anything in there, he wouldn't have anything to hide. So, you know, he would have allowed him to search it. But I guess, you know, either the agent had probable cause to look at the backpack or there was consent. And I'm just trying to figure out, was there voluntary consent here in light of the circumstances? And the district court's finding was that there was voluntary consent. And in addition to the passage I referenced, the district court actually made a finding under the totality of the circumstances that the questioning was reasonable and didn't rise to the level required for detention. And that's at the excerpt of record at page 9. So, again, his reference there to detention and his familiarity with the border context and with questioning at the border is that this was not one that would trigger Miranda and wouldn't trigger custody. Would a reasonable person have felt free to walk away and leave his passport in the agent's hands? A reasonably innocent person, and the test would be a reasonably innocent person, would feel free that once he answered briefly these questions during a temporary detention, he would have been free to leave. Again... But even without his passport? But the questioning at that point, even though he had his passport, the test was... The agent had his passport. The agent had his passport. The test wasn't whether or not he would be free to leave, you know, as if he were encountered on the street. It's there's immigration questioning going on, and would he be... Would a reasonable person, a reasonably innocent person, be free to leave after the temporary questioning while the agent's holding his passport? And, again, that's a standard that's also articulated in the Guzman Padilla. So I'm just... You're saying so he would have been... The gentleman in the van, the defendant here, the appellant, would have been free to walk away or to say no to the search or walk away once the agent asked him to search his backpack? Well, once the agent was satisfied with his line of immigration questioning, because the agent, the whole time he was holding the passport, was asking questions to dispel his suspicions, the suspicions that had been aroused by the fact that he was getting scripted responses that seemed to him like someone who had been placed on a shuttle van by a smuggler. And he'd also already noticed that the defendant's hand was shaky. And so at that point, coupled with the additional levels of suspicion, which is what the district court was finding, the agent proceeded to ask additional questions. And these questions are what have been determined as the valid sort of questions allowed under Martinez, Fuerte, Barnett, and the series of Ninth Circuit cases. So the district court's finding was that basically once, even if we were to look at... and that there was no... that the minimal level of articulable suspicion was present to have him exit the van. And then the district court also found that basically, even though he found that... and this is excerpt of record at 12, under all the circumstances, I would find that this was an escalation of questioning that was reasonable under the totality of circumstances and didn't even require the standard required for detention. And he goes on to mention that there was reasonable suspicion for detention, which existed from the time that the answer seemed scripted and nervousness was exhibited when the passport was shown. And those would be grounds to detain him to look into the matter of his citizenship. I wanted to ask you this. Do we have any information on the relationship between a person appearing to be nervous and that person's ultimate guilt? If I understand the question, the question is, was there any testimony or any finding as to the nervousness that the defendant exhibited? And the district court did make a finding that, based on the record, there was nothing else to indicate that the nervousness was anything but consciousness of guilt. And this was an excerpt of record at 9. I don't hear anything indicated... Does that mean that a nervous person who is stopped by the authorities and whose hands shake or shows some fear or anxiety, does that raise the presumption of guilt? No, certainly not. A wrongdoing? You know, a lot of people, I'm sure people get stopped by the police, and especially the minority people. This thing stops a lot, even if for no reason, or just a minor pain like that. It's not really that they're not anxious, nervous, wondering if they're going to have to pay a $500 fine. And a lot of things can make people nervous, anxious. And some people who are guilty, the community offenders can be as calm as the steel ladder. But I really want to know if any studies have been done that show a relationship between nervousness, shakiness, and consciousness of guilt. Well, Your Honor, just briefly, the Prosciutto Robles, the Ninth Circuit case, found that visible nervousness, including shaking, was sufficient for the officer's request for a search after the immigration papers had actually been produced. And I think perhaps some of Your Honor's concerns is, this is one where it's not an arbitrary stop, it's already a permanent check. I am just asking you a general question. I mean, for years and years we were so enamored, I can't say that I was, of eyewitness identification. And today, if you read about these studies conducted at universities throughout the country that tell us that eyewitness identification is highly unreliable. And even when the identification was made, shortly after the event. So I just wondered, since you're interested in the field of criminology, have you run across any study? I haven't run across any particular study, Your Honor. Okay, thank you, Ben. We're out of time, so if you have a minute, if you'd like to take it. I don't think I need that long. I just need two points. First of all, the government identifies two points, shakiness and the scripted answers. Nervousness, as I pointed out in the brief, from cases from the 9th, 5th, 10th, 8th circuit, all saying that nervousness does not carry the day. Nervousness just means people get nervous around law enforcement. I'm a law-abiding person. I get nervous around law enforcement. That's just a natural reaction. Scripted answers, again, both of those things together, they are only indicative of alien status. But when an officer has the reasonable means of dispositively, definitively dispelling that suspicion in his hand, it is not reasonable to continue the detention further to go off in other areas. He had the answer in his hand and failed to look at it, failed to use it. Judge Collins' question about the legal standard that the district judge applied, when a district court makes a finding on the basis of the wrong law, that is error. That's what this court has held in Hinkson, England, and the Supreme Court held in Kuhn. If you apply the wrong law, the decision is wrong. And the factors here, as I pointed out in the brief, pages 33 to 36, the factors line up in favor of showing that this was a coercive granted consent, and so the evidence should be suppressed. Let me ask you a question. Did the light turn on inside the van? Your Honor, this search was at 1130 in the morning. I believe it was in broad daylight. Broad daylight? Correct. So there was no lighting? I don't believe so, no. And all the doors of the van were open. That's how the inspectors talked to the passengers. They opened all the doors. Okay. Well, thanks for the briefing. Thank you. Thank you. Thank you. The case is now submitted. Thank you very much for your argument here today. We're ready to proceed to the next case, which is Juan Moreno v. La Curacao. Is that the next case? Oh, I'm sorry. That's been submitted on the brief. You're correct. So the next case is United States of America v. Joshua Vincent Fowlter. Thank you.
judges: Conlon, Pregerson, Murguia